FinalVLBUNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANDREW WOODWARD, | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:10-CV-01957 (VLB) |
| v. | : | |
| | : | |
| SCAPA NORTH AMERICA, | : | |
|     Defendant. | : | December 6, 2012 |

## RULING ON APPLICATION OF FOREIGN LAW [Dkts. 33, 34]

I.      Introduction

Pursuant to Fed. R. Civ. P. 44.1, Defendant Scapa Group, PLC, d/b/a Scapa North America ("Scapa") filed on the docket a Notice of Foreign Law, providing the Court and Plaintiff with notice of its intent to raise an issue concerning United Kingdom ("U.K.") law in response to Plaintiff's contention that Scapa failed to pay "amounts owed to him under the nine months' notice provision" in his employment agreement governing his assignment with Scapa in the U.K.  [Dkt. 27, Notice of Foreign Law]  In response to this notice, the Court ordered Scapa to identify and brief the issues of foreign law, and ordered Woodward to respond to such briefing.  The parties have subsequently identified and briefed the issue.  [Dkt. 33, Scapa Memo; Dkt. 34, Woodward Response]  While Defendant Scapa argues that under Connecticut choice of law principles U.K. law controls the pay dispute at issue, Woodward contends that because he returned to the United States, the terms of his employment agreement dictate that Connecticut law applies.  [*Id.*]  The Court now considers the application of U.K. law.  For the reasons stated below, the Court concludes that the law of the United Kingdom

1

applies as Woodward was still on his U.K. assignment and subject to the terms of the U.K. Agreement during the period in question and that the U.S. Agreement had been terminated.

## II.     Factual Background

Woodward entered into an employment agreement entitled "Agreement Management" in 1996 with the predecessor of Scapa, Coating Sciences, Inc. (the "U.S. Agreement").  [Dkt. 1, Compl. at 7; Dkt. 43 U.S. Agreement at preamble, ¶ 10(g)]  The parties do not dispute that Scapa Group, plc, doing business as Scapa North America, succeeded to the rights and obligations of the U.S. Agreement upon its acquisition of Coating Sciences, Inc.  The U.S. Agreement states that it "shall be construed pursuant to and in accordance with the laws of the State of Connecticut."  [Dkt. 43, U.S. Agreement at ¶ 10(i)]  It also includes a provision entitling Woodward to six months' severance upon termination without cause to be paid monthly in arrears.  [U.S. Agreement at ¶ 7]  In 2005, Woodward accepted an assignment with Scapa Group, plc in the United Kingdom as outlined in the "Temporary Assignment Letter" issued to him.  On December 7, 2007 Woodward became European Managing Director of Scapa Group, plc doing business as Scapa Europe.  [Compl. at ¶ 9]  Thereupon Woodward and Scapa Group, plc entered into an agreement governing his assignment in the United Kingdom (the "U.K. Agreement").  [Compl. at ¶ 13; Dkt. 43, U.K. Agreement]

The U.K. Agreement states that it

> outlines the principal terms and conditions of your
> assignment to the United Kingdom and, insofar as they
> are different from the terms of your USA contract,

2

> constitute a temporary variation to your current contract of employment in the USA. These terms and conditions will be effective only during the time you remain in the UK, and only for the period of this assignment, after which you will revert to the standard terms and conditions of your USA contract or another contract agreed between yourself and Scapa Group.

[Dkt. 43, U.K. Agreement at preamble]  The U.K. Agreement also provides that:

> The assignment will start on 1 January 2008 following the end of your current assignment as European Commercial Director and will continue for a period of 2 ½ years.  Six months before the end of the period we will discuss with you your next role in the Group including the guarantee that you will return to the USA at the end of the assignment to a position at least as favourable in terms and conditions of employment and status as that which you occupied before this assignment (i.e. VP Commercial).

[Dkt. 43, U.K. Agreement ¶1]  It further directs that "You will remain on the US payroll during the period of this assignment and continue to participate in the benefit programmes available to salaried employees, including the Scapa North America Inc Pension Plan, Scapa North America 401K Savings Plan, Life Insurance, Short and Long Term Disability Insurance, and the Company's Business Travel Insurance Plans, Dental Insurance."  [Dkt. 43, U.K. Agreement ¶13]  Additionally, Woodward was "entitled at the Company's expense to the cost of eight economy return airfares to the USA per year during this assignment."  [Dkt. 43, U.K. Agreement ¶9]  Scapa also agreed to repatriate Woodward to the United States at company expense if he was terminated for reasons other than his misconduct.  [Dkt. 43, U.K. Agreement ¶14]  The U.K. Agreement includes a termination notice provision as follows:

3

> **Your employment will be subject to nine months termination by either party, during which all the terms and conditions and benefits of this role will remain in place.  If the employment is terminated by the Company for any reason other than your own misconduct, you and your family will be repatriated to the USA at the Company's expense.  If you terminate the employment voluntarily or it is terminated as a result of your own misconduct, the Company will not be responsible for the cost of repatriation.**

[*Id.* at ¶ 14]  The choice of law provision in the U.K. Agreement states:

> **Any matters of interpretation of this agreement insofar as it varies the terms of your USA contract of employment will be subject to the practices of Scapa Group in the UK and the provisions of UK law.  In all other respects, the provisions of the US contract will take precedence.**

[*Id.* at closing]  The U.K. Agreement also described Woodward's role as European Managing Director and Woodward's hours of work.  [*Id.* at ¶¶ 2, 11]

On November 17, 2009, Scapa Group, plc sent Woodward a letter (the "2009 Letter") confirming its oral notice that it was terminating Woodward's employment.  [Dkt. 33, Scapa Memo at Exh. C, 2009 Letter]  In accordance with the nine months' termination notice provision contained in the U.K. Agreement, the 2009 Letter stated that Woodward's employment with Scapa would be terminated effective August 17, 2010.  [*Id.*]  The 2009 Letter further stated:

> **You are no longer required to attend work unless specifically requested to do so and you should therefore refrain from attending the offices or contacting any of our customers, suppliers, employees, officers or representatives.  However, you will remain employed by Scapa NA and must be available during normal working**

4

> hours to deal with any work-related matters that may arise. You will continue to receive your normal salary and contractual benefits up to your final day of employment.
>
> During your notice period, you should not undertake any other business or profession without prior written consent of the Company, or be or become an employee, officer or agent of any other firm, company or person.

[*Id.*] Consistent with Scapa's use of abbreviations, the Court interprets Scapa NA to mean Scapa North America.

Prior to the expiration of the notice period and shortly before February 5, 2010 Woodward returned to the United States. The parties have not indicated whether he returned on holiday or was repatriated. There is no evidence that Woodward was no longer employed by Scapa or that he was no longer required to be available during normal working hours to deal with any work-related matters that may arise, nor is there any evidence that he did not continue to receive his normal salary and contractual benefits after his return to the U.S.

Three months after receipt of the termination of his U.K. assignment and shortly after his return to the U.S., Scapa Group, plc sent Woodward a second letter notifying him that his employment with Scapa North America was terminated effective immediately (the "2010 Letter"). [Dkt. 33, Scapa Memo at Exh. D; Dkt. 34, Woodward Response at p. 4] In this 2010 Letter, Scapa noted that "[t]he 2007 agreement provides that after your UK assignment concluded, you reverted to the terms and conditions of your USA contract, that is, the 'Agreement Management' dated January 31, 1996." [*Id.*] The 2010 Letter further provided that

5

Woodward had been informed that his "employment by Scapa North America, Inc would terminate on August 17, 2010," the same date on which the U.K. Agreement was to terminate.  [*Id*.]  It further provides:

> Scapa North America Inc now gives you notice that it is terminating your employment, without cause, effective February 14, 2010.  You will *continue* to be compensated through August 17, 2010.  This will *include* the six-months of severance payments provided for in paragraph 7 of the 1996 agreement as well as pay *in lieu* of the remaining portion of the notice of termination provided to you in November.

[*Id*. (emphasis added)]  The 2010 Letter also reminded Woodward of his noncompetition obligations ongoing until August 13, 2011, which were contained in the U.S. Agreement. [*Id*.]

On June 21, 2010, Woodward began employment at Vernay, a company not affiliated with Scapa.  [Dkt. 33, Scapa Memo at Exh. E (Woodward Depo.), p. 171] Scapa reduced by the amount of income Woodward earned from Vernay the severance payments due under the U.S. Agreement in accordance with the principles of mitigation under United Kingdom law.  Woodward contends that Connecticut law applies because he was physically present in the State of Connecticut when Scapa reduced his severance payments and that under Connecticut law he is entitled to severance notwithstanding the fact that he secured another position.

### III. Discussion

The parties have asked the Court to interpret the agreements and to determine whether United Kingdom or Connecticut law applies to Woodward's claim that Scapa failed to pay him amounts due under the notice provision in the U.K. Agreement which expressly designated U.K. law as controlling. Scapa contends that U.K. law governs because the plain language of the U.K. Agreement deems that U.K. law applies to interpretation of the contract. Scapa further argues that, upon Woodward's employment with another company in June, 2010, Woodward breached the terms of the U.K. Agreement. [Dkt. 33, Scapa Memo] Woodward, on the other hand, urges that Connecticut law applies because he had physically returned to the United States with Scapa's consent, necessitating reversion to the terms of the U.S. Agreement and the Connecticut choice of law provision. In support, Woodward cites the U.K. Agreement, which provided that its terms and conditions would "be effective only during the time you remain in the UK." [Dkt. 34, Woodward Response]

As a federal district court sitting in diversity, this Court is "obligated to apply the law of the forum state in analyzing preliminary choice-of-law questions." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003); *see also MacDermid, Inc. v. Raymond Selle and Cookson Group PLC,* 535 F. Supp. 2d 308 (D. Conn. 2008) (JBA) (holding same). Accordingly, this Court must apply Connecticut choice of law to determine which law applies. The Connecticut Supreme Court has adopted the Restatement (Second) of Conflicts

7

of Laws for the purpose of determining which law applies to the interpretation of a contract.  *Elgar v. Elgar*, 238 Conn. 839, 851-52 (Conn. 1996).  The Restatement (Second) of Conflicts of Laws provides:

> **(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.**
>
> **(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either**
>
>> **(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or**
>>
>> **(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.**
>
> **(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.**

Restatement (Second) of Conflict of Laws § 187 (1971).

Here, the parties have chosen the laws which should apply to a dispute over the terms of their agreements.  Neither party has asserted that either the U.K. or Connecticut lacks sufficient contact with the subject of the contractual relationship or that either public policy or the law of either jurisdiction would be offended by the application of the law of the other.  Thus, the Court concludes

8

that the parties' choices in the Agreements to apply U.K. law to the U.K. Agreement and Connecticut law to the U.S. Agreement as indicated in the respective choice of law provisions are valid.

Next, as the parties dispute whether the choice of law provision in the U.S. Agreement became controlling upon Woodward's physical return to the United States, the Court must interpret the contractual provisions at issue. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction." *Murtha v. Hartford,* 303 Conn. 1, 7-8 (Conn. 2011). *See also Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 260 (Conn. 2011) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . . We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract . . . ."). "Where the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity.... Similarly, any ambiguity in a [written instrument] must emanate from the language used in the [writing] rather than from one party's subjective perception of the terms.... If a contract is unambiguous within its four corners, the determination of what the parties intended by their contractual

9

commitments is a question of law."  *Murtha,* 303 Conn. at 7-8 (internal quotation marks and citations omitted); *see also Harbour Pointe,* 300 Conn. at 260-61 (Conn. 2011) ("[A] contract is unambiguous when its language is clear and conveys a definite and precise intent . . . .  The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity . . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous . . .") (internal quotation marks and citations omitted).

After analysis of the U.K. Agreement and the information provided by the parties, the Court concludes that U.K. law governs the rights and obligations of the parties, including the question of whether Scapa breached the terms of the U.K. Agreement, as the agreements here are unambiguous.  At the start of Woodward's employment with Scapa, he was subject to the U.S. Agreement. After several years of employment Woodward accepted a temporary assignment to the U.K., after which point he entered into the U.K. Agreement.  The terms of the U.K. Agreement modified the U.S. Agreement during Woodward's tenure as a Managing Director of Scapa Group, plc in Europe and denoted that U.K. law would control "any matters of interpretation of this agreement insofar as it varies the terms of your USA contract of employment."  The Court notes that the notice provision in the U.K. Agreement – which provided for continuation of payment to Woodward until the termination of the notice period – amended the severance provision of the U.S. Agreement for the tenure of Woodward's assignment to the U.K.  "Severance pay policies serve two objectives: first, to protect employees

10

from the economic hardship of joblessness, and second, to reward employees for past service to the company." *Bradwell v. GAF Corp.*, 654 F.2d 798, 801 (2d Cir. 1992). *See also Kosswig v. Timken Co.*, No. 3:06cv499 (PCD), 2007 WL 2320537 (D. Conn. Aug. 10, 2007) (noting Second Circuit's holding of same); *In re Enron Corp.*, 300 B.R. 201, 216 (S.D.N.Y. 2003) (holding same); *Gilbert v. Burlington Inds., Inc.*, 765 F.2d 320, 325 (2d Cir. 1985) ("Although severance pay is often a reward for past service, it also serves the same purpose as unemployment benefits. When ties that bind an employee to his or her company are severed by the employer, unemployment for the employee-whether fleeting or permanent-is an inexorable consequence."). Likewise, notice requirements "in employment relationships . . . are principally viewed as protecting employees against suddenly being left without either a job or a salary." *Holt v. Seversky Electronatom Corp.*, 452 F.2d 31, 34 (2d Cir. 1971) (interpreting New York law). Thus, where the intent of both the severance payments under the U.S. Agreement and the notice payments under the U.K. Agreement were the same – to allow Woodward to be held over financially while searching for new employment – the Court must conclude that the notice provision in the U.K. Agreement supplanted the severance provision in the U.S. Agreement such that while Woodward was engaged in his assignment to the U.K., he was entitled to notice payments upon notice of termination, not to both notice and severance payments.

The U.K. Agreement specifically contemplated that Woodward's assignment to the U.K. would be temporary and upon his repatriation he would return to the United States "at the end of the assignment to a position at least as

11

**favourable in terms and conditions of employment and status as that which [Woodward] occupied before this assignment." [Dkt. 43, U.K. Agreement at ¶ 1] Per the U.K. Agreement, Woodward was terminable at will effective nine months after he received notice of his termination. Scapa gave such notice on November 17, 2009 and denoted August 17, 2010 as the end date of this notice period and Woodward's termination date. The parties agreed that Woodward would revert to the U.S. Agreement after his U.K. assignment ended; however, the U.S. Agreement was terminated on February 5, 2010 pursuant to the 2010 Letter and prior to the termination of the notice period in the U.K. Agreement, with severance payments terminating coterminous with the end of the termination notice period under the U.K. Agreement. Thus, there remained no U.S. Agreement to which Woodward could revert upon the termination on August 17, 2010 of the U.K. Agreement. Under the plain terms of the U.K. Agreement, Woodward was an employee of Scapa Group, plc in the U.K. and subject to the terms and conditions of the U.K. Agreement until the date upon which the nine months' notice period expired: August 17, 2010, which date occurred after the termination of the U.S. Agreement.**

**Pursuant to the U.K. Agreement, Woodward remained an employee of Scapa Group, plc in the U.K. until August 17, 2010 as he was obligated to remain available for and to attend to Scapa Group's business matters. The U.K. Agreement provided that, during the notice period, "all the terms and conditions and benefits of [Woodward's role with Scapa] will remain in place." The 2009 Letter sent by Scapa notifying Woodward of his impending termination explicitly**

provided that Woodward must be available during normal working hours to attend to company matters upon request and should not undertake new employment without Scapa's written permission before the end of the notice period. The matters to which Woodward was obligated to attend – as he had been a European Managing Director for several years – were Scapa Europe matters with which he was involved prior to notice of his termination. Moreover, the U.K. Agreement clearly contemplated reversion to the U.S. Agreement to be incident to Woodward's continued employment by Scapa Group, plc and his installation in a new position at Scapa North America following the successful completion of his European assignment, which never occurred. Consequently, the reversion provision of the U.K. Agreement was never triggered. Before the end of the notice period, Woodward returned to the United States and took a position with another company. Because the notice period under the U.K. Agreement did not expire until August 17, 2010, at which time Woodward would cease to be a Scapa employee, Woodward's assignment to the U.K. and his obligations under the U.K. Agreement did not end until that date. As a result, the Court holds that U.K. law governs any rights to compensation and any alleged breaches of the U.K. Agreement up to August 17, 2010. See *Cruz v. Visual Perceptions, LLC,* 136 Conn. App. 330, 334 (Conn. App. Ct. 2012), *cert. granted on other grounds*, 306 Conn. 903 (Conn. 2012) ("When, as here, there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . Accordingly, our review is plenary.").

Woodward argues that U.S. law must apply because he reverted to the U.S. Agreement upon his physical return to the U.S., with Scapa's consent.  The Court finds this interpretation to be contrary to the plain terms of both the U.S. and the U.K. agreements.  The U.K. Agreement provides that the "terms and conditions [of the UK Agreement] will be effective only during the time you remain in the UK, and only for the period of this assignment," after which time Woodward and his family would be repatriated to the United States and he would revert to the U.S. Agreement.  Woodward relies solely on the first portion of this provision, thus concluding that his apparently unilateral return to the United States reinstated the U.S. Agreement and terminated the U.K. agreement.  The terms of the agreements do not support such a construction.  The U.K. Agreement stated that Woodward would revert to the U.S. Agreement only upon termination of his U.K. assignment.  The U.K. assignment did not terminate until August 17, 2010 under the plain terms of the U.K. Agreement and the obligations contained thereunder, at which point Woodward ceased his term as a Managing European Director.  Woodward could not discharge his obligations under the U.K. Agreement until August 17, 2010 and thus was bound by the U.K. Agreement until that date, regardless of his physical return to the United States.

Another provision of the U.K. Agreement militates against the interpretation advocated by Woodward.  The parties could not have meant that Woodward's physical location controlled which agreement applied.  The U.K. Agreement had a term in excess of one year and yet provided that Woodward was "entitled at the Company's expense to the cost of eight economy return airfares

14

to the USA per year during this assignment."  [Dkt. 43]  The only reasonable interpretation of the return to the U.S. language is Woodward's return to a position at Scapa North America after the expiration of his U.K. assignment.

Furthermore, even if Woodward correctly interprets the U.K. Agreement to condition reversion to Connecticut law on his physical return to the United States (which the Court does not credit), he conveniently omits the second half of the provision: "*and* only for the period of this assignment."  If Woodward's construction is correct, then both of these conditions must have been met before Woodward could have reverted to the U.S. Agreement: Woodward must have left the U.K. *and* Woodward's U.K. assignment must have come to an end.  Here, Woodward's U.K. assignment did not end until August 2010; thus, reversion to U.S. law could not occur upon his physical return to the United States alone.

Moreover, as explained above, the U.S. Agreement was terminated prior to the expiration of the notice period and Woodward's termination by Scapa; therefore there was no U.S. Agreement to which Woodward could have reverted upon his return to the U.S.  Likewise, the Court does not credit the allusion in the 2010 Letter to Woodward's reversion to the U.S. Agreement upon his physical return to the U.S. because this assertion ignores the fact that Woodward remained employed by Scapa as a U.K. employee until the end of the U.K. Agreement's notice period.  The Court also notes that, although Woodward contends that he returned to the U.S. *with Scapa's permission*, this does not alter in any way Woodward's obligations under the U.K. Agreement, including his obligation to be available to attend to matters regarding his U.K. position,

15

consideration for which were the payments under the notice provision. Additionally, this contention also does not clarify whether Woodward returned to the United States temporarily (as he was entitled to do occasionally based on his vacation time and the provision of eight return tickets per year to the U.S.), or whether Woodward was repatriated by Scapa under the U.K. Agreement.

Finally, it bears pointing out that if the Court were to credit Woodward's contention that the U.K. Agreement ceased to control upon his physical return to the U.S., the Court would be required to conclude that the additional benefits provided under the U.K. Agreement, including the pay due to Woodward during the notice period, would also be forfeit upon his return to the United States, as the terms and conditions contained in the U.K. Agreement would then only be applicable during Woodward's time physically spent in the U.K.  In other words, the current provision stating that the "terms and conditions [of the UK Agreement] will be effective only during the time you remain in the UK, and only for the period of this assignment," would necessarily be revised to read only that the "terms and conditions [of the UK Agreement] will be effective only during the time you remain in the UK."  Woodward would thus be due nothing further under the UK Agreement after the date of his return to the U.S.  The Court disagrees that conditioning the existence of *certain* terms and not others under the U.K. Agreement upon Woodward's physical location in the U.K. is not a viable reading of the U.K. Agreement.

Lastly, the Court notes that the deposition testimony on which Woodward relies is, at best, not dispositive and far from complete.  Woodward has submitted

16

to the Court only two pages of testimony offered by Scapa's HR Director Stephen Robinson, both of which are excerpts of larger lines of questioning, the details of which Woodward fails to provide. The relevant portion of this testimony is as follows:

> Q: I believe that I understood your testimony to be that if Mr. Woodward, *at the end of his UK assignment*, if he returned to the USA he would be governed by the USA contract. Correct?
>
> A: That is correct, yes.

[Dkt. 34-1(emphasis added), Woodward Response at Exh. 3] The Court is unable to glean from this snippet of testimony that the U.S. Agreement supplanted the U.K. Agreement upon Woodward's physical return to the U.S. It is unclear here if Robinson was offering testimony as to the events at issue in this action or offering testimony as to the general terms in the U.K. Agreement, and it is not clear whether Robinson is equating a return to the U.S. with the end of Woodward's contractual assignment to the U.K., or if he considers the two events to be distinct. It is also unclear if Robinson is referring to a return to the U.S. occasioned by the end of Woodward's assignment to the U.K. and return to the U.S. by way of his acceptance of a subsequent U.S. position with Scapa; the U.K. Agreement specifically contemplated this eventuality. Because Woodward has not provided context to this line of questioning contained in pages before or after this excerpt, because the testimony provided is vague and ambiguous, and because Woodward's interpretation of this testimony goes against the plain language of the U.K. Agreement, the Court may not infer that it supports or negates Woodward's contention that U.S. law applied upon his physical return to

17

the U.S. Moreover, what is clear from the deposition testimony is that only on August 17, 2010 at the end of his U.K. assignment would Woodward's employment be governed by the U.S. Agreement. On that date, however, the U.S. Agreement no longer existed.

IV.  **Conclusion**

For the foregoing reasons, the Court finds that the U.K. Agreement remained in effect until the end of the Agreement's nine-month notice period and effective termination date of Woodward's assignment to the U.K. and employment with Scapa: August 17, 2010. Because the U.K. Agreement specifically appoints U.K. law as applicable, any breach of the U.K. Agreement and any payments due under it must therefore be governed by U.K. law.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: December 6, 2012